ARNOLD NAMROW AND LILLIAN NAMROW, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JAY C. MAXWELL AND DOROTHY N. MAXWELL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 66376, 67914. Filed November 30, 1959.

*Carolyn E. Agger, Esq.*, and *Elizabeth S. Freret, Esq.*, for petitioners.

*Neil J. O'Brien, Esq.*, and *George J. Rabil, Esq.*, for the respondent.

MULRONEY, *Judge:* Respondent determined a deficiency in income taxes of petitioners Arnold Namrow and Lillian Namrow in Docket No. 66376 for 1954 in the sum of $376.84 and refused to allow said petitioners claimed overpayment of Federal income tax for said year in the sum of $129.22. Respondent also determined deficiencies in the income taxes of petitioners Jay C. Maxwell and Dorothy N. Maxwell in Docket No. 67914, for the years 1954 and 1955 in the sums of $290.90 and $639.44, respectively.

The two dockets were consolidated for trial upon joint motion of petitioners because of the similarity of the main question in each docket which has to do with respondent's disallowance of expenses incurred by the doctors as students in psychoanalytic institutes. The issues are whether such expenses are deductible as business expenses, and, in the alternative, whether the portions of such expenses, namely, the expenditures for each doctor's personal psychoanalysis, are deductible as medical expense. In Docket No. 67914 there is presented an issue as to automobile expenses incurred by Jay C. Maxwell in connection with his training at the psychoanalytic institute.

### FINDINGS OF FACT.

Some of the facts in each docket have been stipulated and are incorporated herein by reference.

Petitioners Arnold Namrow and Lillian Namrow are husband and wife and reside in Bethesda, Maryland. They filed a joint income tax return for the calendar year 1954 with the district director of internal revenue, Baltimore, Maryland.

Petitioners Jay C. Maxwell and Dorothy N. Maxwell are husband and wife. During the taxable years 1954 and 1955 they resided in Washington, D.C. At the present time they reside in Houston, Texas, where Maxwell is a teacher in the Baylor University Medical School. They filed joint returns for the taxable years 1954 and 1955 with the district director of internal revenue, Baltimore, Maryland.

The petitioner Arnold Namrow, sometimes hereafter referred to as Namrow, was, throughout the year 1954, engaged in the practice of psychiatry in Washington, D.C.

The petitioner Jay C. Maxwell, sometimes hereafter referred to as Maxwell, was, throughout the years 1954 and 1955, engaged in the practice of psychiatry in Washington, D.C.

Namrow and Maxwell will sometimes hereafter be referred to as petitioners.

Psychiatry is that branch of medicine which deals with the study and treatment of mental disorders. Psychiatry is a medical specialty, recognized as such by the American Medical Association and by the Advisory Board for Medical Specialties in conjunction with the American Medical Association, the American Psychiatric Association, and the American Neurological Association.

The minimium qualification of a doctor as a psychiatrist is achieved by graduation from a recognized medical school, 1 year of general internship, and 1 year of specialized residency in an approved institution treating mental disorders. The institution must be approved by the American Medical Association and the American Psychiatric Association. A psychiatrist who has achieved the minimum qualification may properly practice psychiatry without any further training.

The Washington Psychoanalytic Institute is a school for, as its yearly bulletin states (1953–1954), "the training of psychiatrists in the theory and practice of psychoanalysis." It has, according to the same bulletin, a "Faculty" composed of 19 doctors listed as "Supervising and Training Analysts" and 7 doctors listed as "Teaching Analysts." The Washington Psychoanalytic Institute was organized in accordance with the regulations and standards of the American Psychoanalytic Association, and it is but 1 of some 14 similar institutes located in principal cities of the United States. The Washington Psychoanalytic Institute has operated as a separate school since the division of the Washington-Baltimore Psychoanalytic Institute in May 1952, into the separate Washington and Baltimore institutes.

The 1953–1954 bulletin of the Washington Psychoanalytic Institute provides for "Formal Registration" during the first 2 weeks of September, with "Lecture and Seminar Instruction" to begin September 28, and for "Thanksgiving Day [to be] A Holiday," and a "Christmas vacation" to begin December 24 with "Lecture and seminar instruction [to be] resumed" January 2. It states the "Second semester begins—January 15."

Applicants to attend the Washington Psychoanalytic Institute must make written application during January and July which, if approved by the selection committee (after personal interview with the applicant), entitles the applicant to register for courses. The bulletin provides for a registration fee of $30 "Upon enrollment as a first year student."

With respect to the requisite qualifications for the student desiring to enroll for training in the Washington Psychoanalytic Institute the bulletin states:

### Scientific Training

The applicant for training in psychoanalysis must be a graduate of a Class A Medical School.

In order to have his application considered, the applicant must have creditably served at least one year's general interneship [sic] in a Class A Hospital approved by The American Medical Association or in a foreign hospital with equivalent rating.

The applicant also must have had one year's full time work in a psychiatric hospital approved by The American Psychiatric Association and The American Medical Association before he may be accepted as a first year student.

It is furthermore understood that he shall have completed three years of approved psychiatric training prior to completion of his training in psychoanalysis.

In the final consideration of experience, the Institute judges the quality of the psychiatric training received, as well as its duration.

### Personality

The applicant for enrollment must satisfy the Faculty of the Institute as to the potentialities in his personality for maturity.

Evaluation of the applicant's suitability is based on interviews with at least three members of the Faculty, which may be supplemented by additional studies and examinations as may be deemed necessary.

### Pledge of Faith

The applicant must pledge himself in writing neither to conduct psychoanalytic treatment nor to represent himself as a psychoanalyst until he has been authorized to do so by the Faculty of the Institute.

According to the bulletin, the Washington Psychoanalytic Institute "offers a complete program of training in psychoanalysis" and in general "The training program * * * consists of the preparatory—training—analysis, theoretical instruction and supervised clinical work." The bulletin also states: "Successful completion of the training program leads to recommendation for local membership in The Washington Psychoanalytic Society," which is a constituent organization of the American Psychoanalytic Association.

The bulletin goes on to describe the three general divisions of the training program, stating the first or "preparatory analysis is the foundation of the student's training to treat disorders of personality [and] no fast rule can be applied as to the duration of this preparatory analysis * * * this may require several years. The termination of the training analysis is determined solely by the achievement of this goal. This objective is freedom from personality factors that would interfere with the ability to conduct psychoanalytic treatment." Five analytic sessions per week are to "constitute the

optimum condition for the continuity of analysis [but] the number of hours is to be determined by the training analyst."

The bulletin states that the second division of the training program of the institute called theoretical instruction, shall consist "of a graduated series of lectures and seminars covering the theory and technique of psychoanalysis."

With respect to the third division of the training program of the institute, or supervised clinical work, the bulletin states, in part, as follows:

Before the completion of his analytic training the student is required to conduct a minimum of four analyses under supervision. Patients used for supervised analysis shall be seen five times per week optimum and four times minimum, with the exception only that alterations in this schedule may be recommended by the supervising analyst for therapeutic reasons. The student is to have at least two supervising analysts, preferably three.

A minimum total of two hundred hours of supervision of analysis is required. Nevertheless, such supervised clinical work shall be continued until a consensus regarding the maturity of the student's work shall have been attained.

It is the responsibility of the student to advise the Executive Assistant in writing at the beginning and termination of supervised work with each patient. There shall be interim reports as required. At termination, the diagnosis, evaluation of treatment, supervisor, total supervisory hours and their frequency, total treatment hours and their frequency and the date of beginning and termination of treatment shall be provided in writing.

When the student has completed his required work, and a consensus has been reached by those who have participated in his training regarding its adequacy, the Education Committee will invite him to consult with one of his supervising analysts in the selection of a suitable case for presentation. He will then prepare a clinical paper regarding the course of his work with a patient whom he has treated and will avail himself of the advice of his supervising analyst during this preparation. He will submit a copy of this to each member of a designated subcommittee which will include the analyst who supervised the case. He will then present this report to an examining panel of three members of the Education Committee.

The bulletin sets forth "The Required Curriculum" for each year for 3 years, stating that this required curriculum "conforms to the Standards of The American Psychoanalytic Association for the training of physicians in psychoanalysis."

The required curriculum for each of the 3 years as listed in the bulletin gives the institute's number for each course, the name of each course, a short description of each course, the name of the faculty member who will conduct each course, the number of sessions and hours each course will be taught, and the charge that will be made for each course. The courses are sometimes described as lectures or seminars. The required curriculum lists three courses for the first year, seven for the second year, and nine for the third year. Many of the courses in the second and third years are continuations

of courses for previous years. Illustrative of the listing of courses in the required curriculum is this listing taken from the first year courses:

102 W The Basic Literature of Psychoanalysis:

A Seminar _____ R. Cohen
The literature of psychoanalysis is studied throughout three years of training. The first year's work concentrates on the fundamental writings of Sigmund Freud as an introduction to the field.
Fifteen sessions, 30 hours; 1st, 3rd, and 5th Mondays, 8–10 p.m.
Beginning October 5 _____ $60

The bulletin provides for "Transfers Of Credit" stating: "Transfers of credit for theoretical instruction shall be accepted from Approved Psychoanalytic Institutes." It also states the institute "reserves the right to require a student to receive additional instruction whenever, in the judgment of the Education Committee, this is deemed necessary."

According to the bulletin "Students in training shall register for Institute courses by written application to the Executive Assistant of the Education Committee before 15 September 1953" and the bulletin states: "All courses will be held at places to be announced upon registration."

Since the students of the institute are doctors who have graduated from medical schools, and who have completed the minimum requirements for the practice of psychiatry (1 year of general internship in a hospital and 1 year's full-time work in a psychiatric hospital) the students can and do engage in private practice while taking training at the institute. While the bulletin divides the courses into 3 yearly periods, it is stated therein that "the student is required to maintain attendance on continuous case seminars and clinical conferences until his supervised work is complete and until the maturity of his analytic ability has been demonstrated." Actually, the minimum time required to complete the training in the institute would be 5 years.

Petitioner Arnold Namrow received his M.D. degree from Washington University in St. Louis, Missouri, in 1947 and after internship in St. Elizabeth's Hospital, Washington, D.C., he was in psychiatric residency at two veterans hospitals in the Washington, D.C., area from August 1948 until February 1951. Sometime in 1951 Namrow applied for training at the Washington Psychoanalytic Institute but he was not accepted due to the large number of applicants at that time. After serving as a medical officer in the Navy from February 1951 until February 1953, Namrow was for a while a psychiatrist in a veterans hospital and later in a child guidance clinic, and, in September 1953, Namrow entered private psy-

chiatric practice with his office at 2025 Eye Street, N.W., Washington, D.C. Meanwhile in June of 1953 Namrow again applied for entrance to the Washington Psychoanalytic Institute and this time he was accepted.

In 1954 Namrow commenced his personal analysis (sometimes called the didactic, professional, preparatory, or training analysis) with Mabel Cohen, a doctor of medicine and one of the members of the faculty of the institute. This analysis was not completed until March of 1957. During the year 1954 Namrow paid Mabel Cohen $2,250 for her services in connection with his personal analysis. During the year 1954 Namrow paid Douglas Noble, another doctor and member of the faculty of the institute, the sum of $375 for his services as a supervising analyst.

Both above payments were made in connection with Namrow's training at the Washington Psychoanalytic Institute. Namrow expects to finish his training in the Washington Psychoanalytic Institute in 1960, at which time he will become eligible for membership in the Washington Psychoanalytic Society and the American Psychoanalytic Association.

Maxwell received his M.D. degree from the Medical School of Duke University in Durham, North Carolina, in 1948. Thereafter he completed his year of general internship and his year of psychiatric residency so that by October 1950 he was a qualified psychiatrist. He entered the Chicago Psychoanalytic Institute, which is 1 of the 14 approved institutes previously referred to, and in 1953 he moved to Washington and he transferred from the Chicago Psychoanalytic Institute to the Washington Psychoanalytic Institute. During part of the year 1954 Maxwell was employed by the United States Public Health Service in Washington as a psychiatrist but at the same time he carried on a private practice as a psychiatrist and he continued his private practice as a psychiatrist in Washington during the year 1955.

In 1950 Maxwell commenced his personal analysis with Bernard A. Kamm, a doctor of medicine, of Chicago. This was undertaken in connection with his training at the Chicago Psychoanalytic Institute. This personal psychoanalysis was completed in 1953 before Maxwell transferred to the Washington Psychoanalytic Institute, but in 1954 Maxwell made a payment to Kamm of $280 for this personal psychoanalysis that had been completed in 1953. Also, during 1954 Maxwell paid $630 to Edna G. Dyar and $75 to Lucile Dooley, and in 1955, $525 to Edna G. Dyar, $360 to Lucile Dooley, and $300 to Andrew B. Evans, all doctors of medicine. All of the said doctors to whom these payments were made were supervising and training analysts and members of the faculty of the Washing-

ton Psychoanalytic Institute and the payments were made for services as supervising analysts.

Maxwell paid fees for seminars and lectures in connection with his courses at the Washington Psychoanalytic Institute in the sums of $270 in 1954 and $610 in 1955. Maxwell expects to finish his training in the Washington Psychoanalytic Institute in 1960, at which time he will become eligible for membership in the Washington Psychoanalytic Society and the American Psychoanalytic Association.

Each petitioner claimed expenditures for his personal psychoanalysis and for services of supervising analysts, as business deductions on their returns.[1] Maxwell also took deductions on his returns for 1954 and 1955 for the fees paid for seminars and lectures. Respondent disallowed these deductions on the ground that the payments were not ordinary and necessary business expenses within the meaning of section 162, I.R.C. 1954, and in the case of Namrow, not medical expenses.

In his 1954 return, Maxwell claimed a deduction for depreciation of his automobile in the sum of $575.04 (approximately 72 per cent of the $800 actual depreciation computed), and automobile expenses of $424.28. The Commissioner allowed a deduction for the two items combined of $306.07.

In his 1955 return, Maxwell claimed a deduction for depreciation of his automobile in the sum of $575 and automobile expense of $763. The Commissioner allowed a deduction for the two items combined of $390.75; he allowed an additional amount of $390.75 as a medical expense, subject to the limitations under that section. This latter item is for transportation incurred by his wife for medical purposes.

The disallowed portion of the automobile expenses is that portion of the automobile expenses claimed by Maxwell for use of the car in attending the courses, lectures, and seminars of the Washington Psychoanalytic Institute.

OPINION.

The main question in these two cases is whether the expenditures by petitioners for their personal psychoanalysis, supervised clinical work, and theoretical instruction are deductible as business expenses under section 162, I.R.C. 1954.

Both parties seem to agree that this issue will be determined by the Treasury regulations which define deductibility of educational expenses as trade or business expense. These regulations were

---

[1] Namrow originally claimed the payment to Dr. Cohen of $2,250 as medical deduction but later, by application for refund, claimed the payment deductible as a business expense.

promulgated by the Treasury subsequent to the decisions cited and discussed by the parties in their briefs. The parties agree that the applicable regulation is section 1.162–5, Income Tax Regs., 1958–1 C.B. 67, printed in the margin.[2]

Petitioners are psychiatrists, which means they possessed the educational requirements for admission to the Washington Psychoanalytic Institute. This record firmly establishes that the Washington Psychoanalytic Institute is a school. It has a faculty, instructors, courses, required curriculum, educational entrance requirements, and the candidates accepted are called students. The institute presents courses and instruction in the theory and training of psychoanalysis, and it issues certificates of graduation or completion to those students who finish the institute courses. The Chicago Psychoanalytic Institute Maxwell first attended in 1953 is a school like the Washington Psychoanalytic Institute.

It is also firmly established by this record that the expenditures here in question for personal psychoanalysis, supervised clinical work, and fees for seminars and lectures, were all made in accordance with the requirements of the institutes by petitioners as students taking the courses and training offered by the institutes.

In fact, Namrow pleaded his selection of Noble as his supervisory analyst, and Cohen as his training analyst, was in accordance with the requirements of the institute and that the fees paid to each were for the services they rendered as supervisory analyst and training analyst. His testimony was all to the same effect and Maxwell's testimony was that his payment to Kamm of the Chicago Psychoanalytic Institute for his personal analysis was in accordance with the requirements of that institute and his other payments to members of the faculty and instructors of the Washington Psychoanalytic

---

[2] Sec. 1.162–5 Expenses for Education.—(a) Expenditures made by a taxpayer for his education are deductible if they are for education (including research activities) undertaken primarily for the purpose of:

(1) Maintaining or improving skills required by the taxpayer in his employment or other trade or business, * * *

\* \* \* \* \* \* \*

Whether or not education is of the type referred to in subparagraph (1) of this paragraph shall be determined upon the basis of all the facts of each case. If it is customary for other established members of the taxpayer's trade or business to undertake such education, the taxpayer will ordinarily be considered to have undertaken this education for the purposes described in subparagraph (1) of this paragraph. * * *

(b) Expenditures made by a taxpayer for his education are not deductible if they are for education undertaken primarily for the purpose of obtaining a new position or substantial advancement in position, or primarily for the purpose of fulfilling the general educational aspirations or other personal purposes of the taxpayer. The fact that the education undertaken meets express requirements for the new position or substantial advancement in position will be an important factor indicating that the education is undertaken primarily for the purpose of obtaining such position or advancement * * *. In any event, if education is required of the taxpayer in order to meet the minimum requirements for qualification or establishment in his intended trade or business or specialty therein, the expense of such education is personal in nature and therefore is not deductible.

Institute after he transferred to the latter institute, were all made for required supervisory analysis services or fees for seminars or lectures of the institute. Both petitioners testified their intention to continue and secure their certificates of completion, issued either by the Washington Psychoanalytic Institute or the American Psychoanalytic Association. By the time they finish they each will have spent 7 years in the psychoanalytic institutes.

Petitioners' position is that the expenditures were made primarily for the purpose of improving their skills as psychiatrists and thus deductible under section 1.162–5(a)(1) or that portion of the regulation stating: "Expenditures made by a taxpayer for his education are deductible if they are for education * * * undertaken primarily for the purpose of * * * improving skills required by the taxpayer in his employment or other trade or business."

Respondent's position is that the record in each case presents the situation described in section 1.162–5(b) of the regulations where expenditures for education are not deductible when undertaken primarily for the purpose of obtaining "a new position or substantial advancement in position" or when the education taken is required "in order to meet the minimum requirements for qualification or establishment in his intended trade or business or specialty therein."

Petitioners argue that throughout the years in question and even before they enrolled at the institute, they were practicing psychiatrists, which is a medical specialty, and recognized as such by the American Medical Association; that psychoanalysis is not a medical specialty, but merely a technique of psychiatric therapy, which they were qualified to employ, and did use in their practice as psychiatrists before they enrolled in the institute; that they merely undertook analysis, supervised clinical work, and theoretical instruction to improve their skills as psychiatrists.

At the outset there must be some discussion of what is meant by these terms: Psychiatry, psychotherapy, and psychoanalysis.

The parties are agreed and the evidence establishes that psychiatry is a medical specialty that deals with the study and treatment of mental disorders. Webster defines it as "The medical specialty that deals with mental disorders, especially with the psychoses, but also with the neuroses." Webster's New International Dictionary, Second Edition. Psychiatry is recognized as a medical specialty by the American Medical Association. One becomes a psychiatrist, qualified to practice the medical specialty called psychiatry, by graduation from a recognized medical school, 1 year general internship, and 1 year of residency in an approved hospital treating mental disorders. Apparently no special examination is required in order to

qualify for the practice of psychiatry but maximum formal recognition is achieved by additional years as a resident physician in a mental institution, additional years of practice of psychiatry, and passing examinations set by the American Board of Psychiatry and Neurology.

Psychotherapy is a broad, general term that is descriptive of the treatment administered by psychiatrists, but apparently it can have an even broader meaning. One of the expert witnesses here defined it as follows:

Psychotherapy is the overall term which implies descriptively, if nothing else, that I am sitting down with a patient in a room and we are talking one to another and sometimes listening, sometimes talking.

\* \* \* \* \* \*

Psychotherapy—I don't know where that comes from except it describes that you are having therapy of the psyche, and it can be given, I am sure, by many a physician and I am quite sure ministers and I wouldn't be a bit surprised if many of your colleagues [lawyers] employ psychotherapy.

Other types of treatment techniques employed by psychiatrists include chemotherapy, occupational therapy, drug therapy, hypnosis therapy, and insulin coma therapy.

When the term, psychotherapy, is confined to its meaning as descriptive of the treatment administered by psychiatrists, it means encouraging the patient to talk freely to the doctor as a method of discovering the history and meaning of the patient's symptoms. It is sometimes called the "talking cure" and it can be of greater or lesser duration, depending upon the patient's immediate symptoms or the broader area of the patient's emotional insecurities and personal difficulties.

Psychoanalysis is defined by Webster as "(a) The method developed by Sigmund Freud for analyzing the content and mechanisms of a person's mental life, for purposes of psychotherapy. By dream analysis and similar devices it aids the patient to discover and relive his unconscious memories and desires and to adjust his mental conflicts. (b) The body of facts discovered by this method. (c) The system of theories based on these facts, and dealing especially with the repression of desires into the unconscious and with the infantile sexuality as the source of conflicts and neuroses. (d) The interpretation of facts from other sources in the light of these theories." Webster's New International Dictionary (2d ed.).

Here again is a term, psychoanalysis, which can carry a broad general meaning. We are told by the experts that anyone can practice psychoanalysis; that no special education or training is necessary in order to practice psychoanalysis; that as applied to psychiatrists it is nothing more than a name given to intensive psychotherapy or the "talking cure" where the doctor sees the pa-

tient 4 or more times a week over a period of 2 or 3 years. But there is other expert testimony that psychiatrists consider the term psychoanalysis to mean a certain technique of psychotherapy founded and developed by Sigmund Freud. Christine Kehne, a psychiatrist, so testified, and Winfred Overholser, a psychiatrist, said: "There are many types of psychotherapy—the psychological approach to the patient. There are many types, and psychoanalysis which is usually defined, I think, or usually accepted to mean the particular variety of psychotherapy that was devised and developed by Sigmund Freud. There are other types of psychotherapy. Some were devised by Jung, for example, Adler, and so on. When we speak of psychoanalysis we usually refer to the Freudian variety." See also Psychology by Norman L. Munn (3d ed.), p. 2, where it is stated: "Freud, a Viennese physician * * * developed the methods and concepts now known as psychoanalysis."

It may be true that any psychiatrist could call himself a psychoanalyst without going to a psychoanalytic institute. Six psychiatrists, including petitioners, testified in this case. Three of them, including Namrow, said they would not call themselves psychoanalysts unless they were in attendance or had completed one of the psychoanalytic institutes like the Washington Psychoanalytic Institute. Two others, including Maxwell, said they would be willing to represent themselves as psychoanalysts without completing an institute if the bulk of their practice was giving psychoanalytic treatment. Maxwell said he had "some awareness" that there were doctors in the Washington area that held themselves out as psychoanalysts "who are not affiliated as far as I know with either the Washington group or the Baltimore group or any society." When asked to name any, he said he could not do so, or, as he said: "Not at the moment." He also testified he knew a psychiatrist in Houston, Texas, who called himself a psychoanalyst who had no affiliation with the American Psychoanalytic Association or its constituent organizations but he doubted "whether it would be ethical for me to mention his name." The other expert who testified, Bullard, was a psychoanalyst, a graduate of the old Washington-Baltimore Psychoanalytic Institute, and a member of the faculty of the Washington Psychoanalytic Institute. He was not asked if he would have considered himself a psychoanalyst if he had not attended an institute. But he did say that one of the reasons for requiring the pledge that candidates not represent themselves as psychoanalysts until authorized by the faculty, was to save the public from being defrauded. It is to be remembered the candidates were all qualified psychiatrists.

Since the expenditures were all for instruction in the practice of psychoanalysis, at psychoanalytic institutes, and, since petitioners

are arguing the instruction was merely to improve their skills, it is vital to their argument that they possessed skill in the technique of psychoanalysis, before enrolling in the institutes. It is petitioners' argument that they were qualified and practicing psychiatrists before enrollment in the institutes; that any psychiatrist is qualified to use psychoanalysis in his practice without affiliation with an institute; and that they both did employ psychoanalysis before enrolling in the institutes. The argument evidently depends on the use of the broad definition of psychoanalysis we have mentioned—the definition that means no more than intensive psychotherapy or "talking," or the definition that permits anyone to hold himself out as a psychoanalyst, whether he ever went to medical school or not. It is certain the petitioners had not, before enrollment in the institute, established themselves as qualified to employ the theory and practice of psychoanalysis, as that term is meant generally amongst doctors or the Freudian variety. As pointed out, when doctors speak of psychoanalysis they mean the Freudian variety (Overholser's testimony) and there is not a word of testimony here that either petitioner had ever taken any course in that variety of psychoanalysis. We think it clear that the theory and practice of psychoanalysis, as recognized in the medical profession, was a skill they did not have when they completed medical school and their 2 years of residency.

The only conclusion to be drawn from the record is that, in attendance at the institute, they were acquiring a new skill, not improving or sharpening up one they already possessed. It is significant that petitioners were committed, under the written pledge taken by all candidates at the institute, not to conduct psychoanalytic treatment or hold themselves out as psychoanalysts until authorized by the faculty of the institute. Overholser was asked whether his understanding of a psychoanalyst "mean[s] somebody who has finished an Institute like The Washington Psychoanalytic Institute." His reply was "that would be the ordinary acceptance." He went on to comment there was no reason why any psychiatrist might not refer to himself as a psychoanalyst, which, of course, is true (except for petitioners who had pledged not to do so) if the broad definition of psychoanalysis, not used by the medical profession, is used.

We think it fairly appears from this record that a psychiatrist cannot establish himself as a psychoanalyst without completing an institute. This becomes more evident from other testimony to the effect that psychiatrists obtain most all of their patients by referrals from other doctors, principally other psychiatrists, because they prefer not to treat people with whom they are acquainted. In view of this, it is extremely unlikely that a psychiatrist could ever estab-

lish a psychoanalytic practice without attendance at an institute. Namrow testified he received the majority of his referrals, and Maxwell, a substantial number of his referrals, from colleagues at the institute.

Petitioners make much of the fact that psychotherapy is a recognized medical specialty by the American Medical Association and psychoanalysis is not. The regulation prohibits, as deductions, expenditures for educational expenses to establish one in a specialty of his profession and gives as an example a general practitioner of medicine taking a course of study in order to become a specialist in pediatrics. The fact that psychoanalysis is not recognized as a specialty by the American Medical Association is not conclusive. Psychoanalysis, as taught by the Washington Psychoanalytic Institute, is certainly a recognized specialty in the sense that it is a special technique that requires affiliation with institutes before there is any recognition amongst doctors that one is qualified to practice it. Any argument that it is not must necessarily resort to the broad definition of psychoanalysis, not the Freudian type of analysis which doctors mean when they speak of psychoanalysis.

Petitioners make a separate argument with respect to the deductibility of the sums paid to their supervisory analysts. As set forth in our Findings of Fact, one of the three general divisions of the training program of the Washington Psychoanalytic Institute was the supervised clinical work. This means, as the bulletin points out, "the student is required to conduct a minimum of four analyses under supervision. * * * The student is to have at least two supervising analysts, preferably three." The supervising analysts were all members of the faculty of the institute and the bulletin, as shown by the quotations therefrom in our Findings of Fact, sets forth the maximum and minimum hours of supervised analysis required for completion of this division of the training, and the requirement for "a clinical paper [by the student] regarding the course of his work with a patient whom he has treated." The bulletin states the student doctor can avail himself of the advice of his supervising analyst in the preparation of this paper and a copy of this paper is to be given to each member of the education committee of the institute.

It was stipulated Namrow paid a faculty member named Noble, $375 during 1954. Namrow alleged in his petition that this sum was paid to Noble "as his supervisory analyst." When asked on direct examination "For what purpose" he had paid $375 to Noble, he answered: "For his services as a supervising analyst for the supervisory analysis." When asked if "this payment include[d] any other services on the part of Dr. Noble," he replied, "No."

It was stipulated Maxwell in 1954 paid faculty members Edna G. Dyar $630 and Lucile Dooley $75, and in 1955, Edna G. Dyar $525 and Lucile Dooley $360 and in the same year $300 to Andrew B. Evans, another faculty member. The following from Maxwell's direct examination shows these payments were to the faculty members for their services as his supervising analysts:

Q. When did you first undertake supervisory consultations in connection with being a candidate at the Washington Institute?

A. I believe it was beginning in January 1954.

Q. Dr. Maxwell, in the stipulation which has been filed there are listed various payments to Dr. Dooley, Dr. Evans and Dr. Dyar. What were these payments for?

A. Those payments were for consultations, discussions of patients that I was at that time treating and they are called supervisory sessions, supervisory analysis. This is supervision of patients that I was treating.

Q. This is the supervisory analysis which we have just mentioned?

A. Yes.

Petitioners argue the above expenditures are deductible as business expenses since they are no more than the usual consultation fees paid by many doctors seeking aid and advice in a difficult case, from some more experienced practitioner. The payments here, as shown by the above quotations from the record, were in no sense the usual fee paid by a doctor for consultation with an expert with respect to a patient's treatment and care. The payments were all to institute instructors, for instruction in one of the three required divisions of training, namely, supervised clinical work. It was the student doctor who was to receive benefit from his consultations with his supervising analyst in the form of instruction as to the proper treatment of the patient. Any benefit to the student's patient would be incidental. The fact that the student doctor paid his supervising analyst the same amount per hour as would be charged by such instructor when called in for consultation by other doctors is immaterial. Petitioners were merely paying for the required clinical supervision course of instruction presented by the institute. There is no material difference in such a payment and a payment for a required seminar or lecture course.

One other argument advanced by petitioners is founded upon the testimony that many psychiatrists secure personal analysis and supervision on a private basis without affiliating at any institute and some attend lectures and seminars at places other than the institutes. Petitioners testified they could have done the same and it was the testimony of each one that he only attended the institute as it was more *convenient* than making private arrangements. This evidence seems to be regarded by petitioners as demonstrating that the primary purpose of each was to improve his skill as a psychia-

trist and affiliation with the institutes was a matter of little or no consideration to them. We are rather skeptical of petitioners' *convenience* testimony and also their argument now made on brief that being a member of the American Psychoanalytic Association, to which education in the institute leads, is not "professionally significant" and "amounts to little more than another set of letters after the doctor's name in the Directory of Medical Specialties." How Namrow would square his *convenience* testimony with his other testimony that he would not call himself a psychoanalyst without institute affiliation is not apparent. At any rate, we fail to see how the fact that petitioners could have received the same instruction from sources outside the school means anything on the issues here involved. The fact is petitioners did attend the institutes. They took the institutes' required courses in the theory and practice of psychoanalysis—meaning the Freudian technique or variety of psychoanalysis. We hold petitioners' attendance at the institutes was not for the purpose of improving skills they already possessed; that the purpose of their attendance at the institutes was to obtain a new or substantial advancement in position and the training they were undertaking at the institutes was to satisfy the minimum requirements for each petitioner to establish himself as a practitioner in the special technique of psychoanalysis. The expenditures as students of the institutes of each petitioner for personal analysis, and for supervisory clinic work and (in Maxwell's case) for theoretical instruction at seminars and lectures, do not constitute deductible expenses under section 162, I.R.C. 1954.

Our holding here is not at variance with our conclusion in *John S. Watson*, 31 T.C. 1014, where this Court allowed the deduction for the expenditure of a medical doctor who undertook personal psychoanalysis in order to improve his skill as an internist. There we recognized "the course was specialized, [but] petitioner was not pursuing it for the purpose of fitting himself to engage in the specialty." The same cannot be said here where it is manifest petitioners were pursuing the specialized courses in psychoanalysis in order to fit themselves to engage in the practice of the specialty.

The record does not support the alternative argument of petitioners that the expenditure each made for personal analysis is deductible as medical expenses. Namrow testified that he did not enter into treatment with Cohen for medical reasons. Maxwell did not testify at all in support of his claim for medical deduction. It is evident that the purpose of each petitioner for undergoing psychoanalysis was to satisfy the required curriculum of the institutes and not for medical reasons.

The remaining issue in Docket No. 67914 has to do with the disallowance of a portion of the deduction for automobile expenses

Maxwell took on his income tax returns for 1953 and 1954. There might be some doubt as to whether petitioner's evidence was sufficient to establish the actual amount of car expense incurred. However, petitioner agrees the disallowed portion was the car expense incurred by Maxwell in driving his car to and from institute courses, seminars, and supervisory consultations. Consistent with our holding that expenditures for the courses at the institute are not deductible, we hold the car expense for driving to and from the institute courses is not deductible. We uphold respondent on the issue. We uphold respondent on all issues in both cases.

Reviewed by the Court.

*Decisions will be entered for the respondent.*

BLACK, *J.*, dissenting: I find myself in disagreement with the majority opinion. Therefore, I respectfully dissent.

As stated in the majority opinion, both parties seem to agree in their briefs that the main issue relating to the deduction of fees paid by petitioners for their own personal psychoanalysis will be determined by the new Treasury regulations which define deductibility of educational expenses as trade or business expense. It is petitioners' contention that the expenses incurred and paid for their own psychoanalysis under circumstances as described in the Findings of Fact are deductible as trade or business expenses under the new Treasury regulations. The Commissioner contends to the contrary and argues that the expenditures were capital expenditures incurred in preparation for a new specialty. The parties seem to agree that the applicable regulation is section 1.162–5, Income Tax Regs., printed in the margin of the majority opinion. It is petitioners' contention that their expenditures for their own psychonalysis come within the ambit of paragraph (a)(1) of the applicable regulation. Respondent contends that the expenditures in question fall within the classification enumerated in (b) of the regulation.

Before I state why I think the majority opinion is in error in holding that the expenses incurred and paid by petitioners Namrow and Maxwell for their own personal psychoanalysis should be disallowed, I think I should state that the following facts are, in my opinion, amply established by the record, including the expert testimony, in these proceedings:

Psychotherapy is the most common form of treatment technique employed by psychiatrists. Other types of treatment employed by psychiatrists are chemotherapy, occupational therapy, drug therapy, milieu therapy, hypnosis, industrial therapy, insulin coma therapy, and shock treatment. Psychotherapy is carried out by encouraging

the patient to talk freely to the doctor as a method of discovering the history and meaning of the patient's symptoms and is sometimes referred to as the "talking cure." The patient's statements are sometimes referred to as "verbal productions." Psychotherapy can be of a greater or lesser duration and can be directed to the narrow area of the patient's immediate symptoms or to a much broader area of the patient's emotional insecurities and personality difficulties;

Psychoanalysis is a name often given intensive psychotherapy, where the doctor sees the patient four or more times a week and makes a thoroughgoing investigation of the patient's present condition, history, and background, in the attempt to get at the ultimate causes for the illness. Intensive psychotherapy, or psychoanalysis, is a recognized medical procedure;

A psychiatrist himself is not required to be psychoanalyzed before he employs psychotherapy with his patients;

There is no specialty of psychoanalysis recognized by the American Medical Association, the American Psychiatric Association, or the Advisory Board for Medical Specialties. There is no American Board of Psychoanalysis;

Although psychiatrists do not generally refer to themselves by the term "psychoanalyst," when they do so refer to themselves, for the purpose of listing in a professional directory or otherwise, they intend to signify by such reference that in the major part of their practice they employ intensive psychotherapy. Doctors describe themselves as "psychoanalysts," who are not affiliated with an institute, or a psychoanalytic society, and who are not members of the American Psychoanalytic Association. In the "Directory of Psychiatrists and Clinical Psychiatric Facilities in the Washington Area" issued by the Washington Psychiatric Society, some doctors list themselves as "psychoanalysts" although they are not members of the American Psychoanalytic Association or of its member societies;

For the success of psychotherapy, it is important that the psychiatrist recognize and remain objective about his own emotional problems, i.e., "blind spots," which can interfere with proper treatment of the patient. The objectivity or emotional maturity required by the psychiatrist differs from that required by doctors specializing in other branches of medicine since the psychiatrist is primarily concerned with emotional or mental illness;

In order to increase their professional competence by achieving and maintaining this objectivity, psychiatrists, regardless of whether they are affiliated in any way with the American Psychoanalytic Association, frequently arrange to be psychoanalyzed. In being psychoanalyzed, the psychiatrist's attention is frequently directed to possible blind spots in his personality by the supervising analyst

where problems arise in connection with cases the psychiatrist is currently treating. The elimination of these blind spots, through his professional analysis, benefits the psychiatrist in his current practice and permits him to give his patient better treatment;

The professional analysis, such as petitioners were taking, lasts about 3 to 4 years. After the analysis is completed, psychiatrists sometimes return for additional analysis as they may find their work requires it. Psychiatrists who undergo this professional analysis pay the treating psychiatrist the customary fees for psychiatric treatment;

Petitioners Namrow and Maxwell incurred and paid the expenses of training in psychotherapy and of psychoanalysis to maintain or improve their skills required by their practice of psychiatry. They did not incur the expenses to obtain new or advanced position, or to enter into any new specialty.

I think petitioners' contention that their expenditures for personal psychoanalysis are allowable deductions should be sustained on authority of *John S. Watson*, 31 T.C. 1014. Incidentally it may be remarked that the *Watson* case was decided by this Court subsequent to the filing by the parties of their briefs in the instant case and is, therefore, not discussed in their briefs. In the *Watson* case, the taxpayer was a physician engaged in the practice of internal medicine. In 1954 the taxpayer, after engaging in practice for 3 or 4 years, decided to obtain training in psychoanalysis and the techniques of psychiatry. He was advised that such training could be obtained in either Cincinnati, Ohio, or Detroit, Michigan. He decided to take it in Detroit and in doing so incurred expenses of $5,184.56 in 1954 and $3,732 in 1955. What he expended in the year 1956, prior to the completion of his psychoanalysis in that year, was not before us in that case. The amounts which were claimed by the taxpayer in the *Watson* case as deductions for business expenses on his returns for 1954 and 1955 were disallowed by the Commissioner. We allowed the deductions as coming fully within the provisions of section 1.162–5(a)(1), Income Tax Regs. This is the provision in the Treasury regulations upon which petitioners rely in the instant case. In the *Watson* case, in holding that the taxpayer was entitled to the deductions which he claimed, we said:

The record clearly shows that petitioner undertook the course for educational purposes and that his aim was to maintain and improve his skill as an internist. The techniques with which he sought to become familiar were useful in his general field of practice. Though the course was specialized, petitioner was not pursuing it for the purpose of fitting himself to engage in the specialty. He continued to practice as an internist but with skills presumably sharpened by his additional training in analysis and psychiatric techniques.

Although the facts in the instant case are somewhat different from the facts in the *Watson* case, I do not think that the difference in the facts of the two cases is sufficient to distinguish them in principle. I do not agree with the majority opinion that the two cases are distinguishable. In the *Watson* case, the taxpayer was a medical doctor practicing internal medicine and went to Detroit to be psychoanalyzed and thus observe the methods used by his analyst and become familiar with the technique of analysis. In the instant case, Namrow and Maxwell were medical doctors and also psychiatrists who were already practicing their specialty of psychiatry. Before they were entitled to practice their specialty of psychiatry they were required to graduate from an accredited medical school, to have 1 year of general internship, and 1 year of specialized residency in an approved institution treating mental disorders. All this Namrow and Maxwell had done and none of the expenses incurred therein are involved here.

Petitioners were psychoanalyzed for essentially the same purpose as Watson was in the *Watson* case, viz, to maintain and improve their skills in their profession. See sec. 1.162–5(a)(1), Income Tax Regs. They were not taking the course, as respondent contends and the majority opinion seems to hold, for the purpose of engaging in a new specialty.

All the expert testimony, as I interpret it, is to the effect that psychoanalysis is but one of the several techniques used by psychiatrists in their practice and is not a specialty within itself; that it is nowhere recognized as a specialty. It is clear from the record, I think, that undergoing professional analysis improves the skill of a psychiatrist in administering the psychiatric treatment of psychotherapy.

On the strength of the testimony of eminent and well-qualified experts on psychiatry and other facts in the record, I would hold that the expenditures involved in the psychoanalysis of petitioners were incurred by them in maintaining or improving their skills in their chosen profession as psychiatrists within the meaning of section 1.162–5(a)(1), Income Tax Regs., and are deductible as ordinary and necessary business expenses.

If Watson, in the *Watson* case, was entitled to deduct under the regulations above cited the $5,184.56 which he expended in 1954 and the $3,732 in 1955 for being psychoanalyzed, I fail to see why petitioner Namrow is not entitled to deduct the $2,250 which he paid to Dr. Mabel Cohen in 1954 for psychoanalysis. Also, I fail to see why petitioner Maxwell is not entitled to deduct the $280 which he paid to Dr. Kamm, of Chicago, in 1954 for his psychoanalysis which apparently was completed in a prior year.

But even if I should agree, which I do not, that these deductions above described should be disallowed, I would still dissent from the majority opinion.

In 1954, petitioner Namrow paid to Dr. Douglas Noble $375 for psychiatric consultation with respect to a patient whom he was treating in that year. Namrow saw the patient, in respect to whose case he had the supervision of Dr. Noble, at least four times a week and Dr. Noble saw the patient once a week.

In 1954, petitioner Maxwell paid $630 to Dr. Edna G. Dyar and $75 to Dr. Lucile Dooley; in 1955, he paid $525 to Dr. Dyar, $360 to Dr. Dooley, and $300 to Dr. Andrew B. Evans for supervision of the treatment of several of his patients in the same manner as described above in the case of petitioner Namrow. It seems to me that these payments are deductible as ordinary and necessary business expenses under the provisions of section 162(a), 1954 Code, without regard to any of the provisions of section 1.162–5(a)(1), Income Tax Regs., which have special relation to expenses for education. The payments which petitioners made to these supervising psychiatrists for their help in treating certain patients were no different in principle, as I see it, from what payments a surgeon might make to some other surgeon whom he called in for consultation in a difficult case or to what a lawyer might pay to another lawyer whom he might call in for consultation and advice in a difficult case. It is true, I suppose, that in most cases such payments for consultation are made direct by the patient or client to the surgeon or lawyer who is called in for consultation. Under such circumstances the payments would not be deductible by the surgeon or lawyer who called in the consulting surgeon or lawyer. The obvious reason why such payments would not be deductible by the doctor or lawyer who calls in the consultant would be that they were paid by the patient or client himself. But if the payments were made by the surgeon or by the lawyer, who called in another surgeon or lawyer for consultation, out of his own funds, I certainly think they would be deductible as ordinary and necessary business expenses.

In discussing this issue of the deductibility by petitioners of the fees which they paid to supervising psychiatrists in the treatment of some of their patients, the majority opinion emphasizes the academic nature of the Washington and Chicago Psychoanalytic Institutes. Neither the statutory provisions here involved, the regulations promulgated supplementary thereto, nor any judicial precedent of which I am cognizant requires that the education or training be acquired other than by attendance at a recognized school. Indeed, the intent of the regulation clearly appears to allow the deduction of scholastic training which would otherwise be deemed personal and nondeductible.

In the instant case, the facts show that petitioners paid the consulting psychiatrists out of their own funds and, as I have already said, I see no reason why these payments are not deductible under the provisions of section 162(a)(1), 1954 Code. This issue was not present in the *Watson* case.

For the foregoing reasons I respectfully dissent from the majority opinion. I do wish to state, however, that I agree with the majority opinion that if the fees paid by petitioners for their own psychoanalysis are not deductible as ordinary and necessary business expenses under section 1.162–5, Income Tax Regs., they are not deductible as medical expenses under section 213, 1954 Code, relating to the deduction of medical, dental, etc. expenses. There is no evidence in the record, as I see it, which would justify the deduction of these payments as medical expenses.

HARRON, TIETJENS, WITHEY, and FORRESTER, *JJ.*, agree with this dissent.